Filed 6/6/22  P. v. Robinson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON NATHANIEL JOEL ROBINSON,<br><br>    Defendant and Appellant. | B317209<br><br>(Kern County<br>Super. Ct. No. BF168297A) |

APPEAL from a judgment of the Kern County Superior Court, John D. Oglesby, Judge.  Remanded with directions.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Michael A. Canzoneri, Carlos A. Martinez, and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Brandon Robinson guilty of various offenses arising out of his sexual assault of three women over the course of about three months in 2017. During trial, his counsel declared a doubt as to Robinson's competence to stand trial. The trial court appointed a psychologist to examine Robinson under Penal Code[1] section 1368, even though that psychologist had been previously retained by the defense. The trial court then found that there was insufficient evidence to hold a competence hearing under section 1368. Robinson's primary contention on appeal thus concerns whether there was substantial evidence to raise a doubt about his competence to stand trial and whether the psychologist's appointment violated, among others, his right to counsel and attorney-client privilege. He also raises instructional issues, contends his sentence is cruel and/or unusual punishment, and argues he is entitled to a *Franklin*[2] hearing. We reject these contentions but remand for reconsideration of Robinson's sentence under recently-enacted ameliorative laws.

## BACKGROUND

I.    The sexual assaults of Andrea I., Diana J., and J.F.

Robinson was charged with offenses arising out of his sexual assaults of three women: Andrea I., Diana J., and J.F.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

2

### A.    *Andrea (counts 1 & 2)*

On March 3, 2017, Andrea, who was 33 years old, was walking home on Wenatchee near Bakersfield College when a man came up from behind her, put an arm around her neck, and told her not to scream because he had a gun.  He bent her over a waist-high wall so that her back faced him.  He pulled down her pants and underwear, massaged her vagina with his hands, and then rubbed his penis against her vagina but did not penetrate her.  After pulling up Andrea's pants, he took money from her purse and told her she could go.

### B.    *Diana (counts 3 to 7)*

On the morning of April 21, 2017, Diana, a 15-year old high school sophomore, was walking to the school bus when she noticed a man behind her.  He grabbed her from behind, around her neck, and told her that if she was smart, she would listen.  Diana waved at a passing car for help, to no avail.  The man choked her harder and told her not to do that again or he would hurt her.  Pointing a gun at her, the man pulled her into an alley, a distance of about 240 feet from where the man had first grabbed her.[3]  From where she had been moved, Diana could see two men working on a truck, but they couldn't see her.

The man pushed Diana up against a gate, with her back to him, and pulled down her shorts.  He stuck his fingers and then his tongue into her vagina.  Although he tried, the man's penis did not penetrate her vagina. The man told Diana that he needed money.  She offered him the three dollars she had, but he said he

---

[3] A police officer testified that he and a fellow officer measured the distance from a stop sign near where Diana had first encountered Robinson to where he assaulted her in the alley.

needed $15. Saying that she would get him the money if he let her go home, they walked to her house, where she got the money and gave it to him. The man said he was sorry and asked if she was mad at him. Diana later identified Robinson as her assailant from a photographic lineup.

C. *J.F. (counts 8 to 14)*

On May 11, 2017, J.F. was a student at Bakersfield College. While washing her hands in the women's restroom in the college's fine arts building, all the lights suddenly went off and a man grabbed her from behind, around her neck, and choked her. Telling her not to scream and that he would kill her, the man touched her vaginal area with his hands, although J.F. didn't think his hand or fingers penetrated her vagina. He turned J.F. so that she was facing the wall and pulled her pants down. J.F. could feel him masturbating behind her. She fell, and he tried to put his penis in her mouth, but she thrashed her head back and forth to stop him. At this point, police officers came into the restroom and arrested the man, Robinson.

D. *Robinson's statement*

After Robinson was arrested, he gave a statement admitting he sexually assaulted three women. When the detective began to ask Robinson about Diana, Robinson repeatedly said he was not a bad person and wasn't in his "right mind." He hated himself and wanted to make it right. He said, "I did it. I did it," and "I just took advantage." Eventually, Robinson admitted that he was walking to Bakersfield College where he was a student when he saw Diana, took her to an alley, pulled her pants down, and touched her "butt" and vagina with his hand. His fingers went inside Diana's vagina, probably twice,

4

and he tried to insert his penis into her "butt." He had a fake BB gun and asked her for money, so she got him $15 from her house.

When the detective then asked what happened on Wenatchee (referring to Andrea) a month before, Robinson initially denied that he had done anything or was there on March 3. Then he said that he took $100 from her purse, pulled her pants down, put her over the bricks, and "pulled my thing out" but didn't put it in. He did touch her butt with his penis, and he probably touched her with his fingers.

Robinson then transitioned to an incident in a bathroom when he turned off the lights because he didn't want to be ashamed. He admitted his penis was "over her" and he tried "to go for the butt" but it did not go into her anus or vagina, although his penis hit her face. When asked how her clothes came off, Robinson said he did it all: he pulled her pants down, touched her vagina, tried to insert his penis in her "butt," and put his mouth on her vagina.

E.    *Defense evidence: Dr. Thomas Middleton*

Robinson's defense was he suffered from a mental disorder that negated his specific intent to commit various crimes. Speaking to that defense, Dr. Thomas Middleton, a psychologist, testified that he evaluated Robinson, and his evaluation included administering tests. Based on his evaluation, Dr. Middleton diagnosed Robinson with "Bipolar I disorder; most recent, episode manic severe with psychotic features" and adult antisocial behavior. Robinson appeared to the doctor to be a hypomanic, meaning a little bit manic, based on Robinson's rapid speech, racing and disorganized thoughts, and mood fluctuations. He did not understand what was happening and why he was incarcerated and kept insisting he was a good person. His insight

5

was impaired, and he reported seeing things, hearing voices, and having delusional beliefs. Testing revealed severely impaired executive functioning and neuropsychological status.

Individuals who are bipolar may self-medicate, and Robinson reported using marijuana, alcohol, cocaine, Xanax, and LSD. He also had been homeless at times and was unable to have productive relationships.

## II. Verdict and sentence

A jury found Robinson guilty of three counts of assault with intent to commit rape by force or fear (§§ 220, 261, subd. (a)(2); counts 1, 5 & 14); two counts of sexual battery (§ 243.4, subd. (a); counts 2 & 10); sexual penetration by force with a minor 14 or older with kidnapping allegations found true (§§ 289, subd. (a)(1)(C), 667.61, subds. (d)(2) & (e)(1); count 3); forcible oral copulation of a minor with a kidnapping allegation found true (former § 288a, subd. (c)(2)(C) [renumbered § 287], 667.61, subds. (d)(2) & (e)(1); count 4); two counts of assault with intent to commit sodomy (§§ 220, subd. (a)(2), 286, subd. (c)(2)(C); counts 6 & 13); two counts of criminal threats (§ 422; counts 7 & 8); assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4); count 9); assault with intent to commit forcible oral copulation (§§ 220, former 288a, subd. (c)(2)(A); count 11); assault with intent to commit sexual penetration (§§ 220, 289, subd. (a)(1)(A); count 12); and robbery (§ 212.5, subd. (c); count 15).

On September 26, 2018, the trial court sentenced Robinson to life without the possibility of parole (LWOP) on count 3 plus a determinate term of 19 years eight months, comprised of six years on count 1, eight months on count 8, six years on count 11, six years on count 14, and one year on count 15. The trial court

6

imposed but stayed sentences on the remaining counts under
section 654, including a second LWOP sentence on count 4.

## DISCUSSION

I.      Instructional error

Robinson contends that the trial court diluted and lowered
the reasonable doubt standard by prefacing its instructions to the
jury with what the trial court called "editorial comments." We
disagree.

The due process clause of the United States Constitution
protects a defendant against conviction except on proof beyond a
reasonable doubt of every fact necessary to constitute the charged
crime. (*In re Winship* (1970) 397 U.S. 358, 364.) Trial courts
thus must take care when departing from standard reasonable
doubt instructions not to suggest either a higher burden of proof
or a lower one. (See, e.g., *People v. Johnson* (2004) 119
Cal.App.4th 976, 985–986 (*Johnson*).) Where, for example, a trial
court equated reasonable doubt with everyday, ordinary
decisions, the error was reversible. (*Ibid.*) In reviewing whether
comments lowered the prosecution's burden of proof, we
determine de novo whether there is a reasonable likelihood the
jury applied them in an unconstitutional manner. (*People v.
Cortez* (2016) 63 Cal.4th 101, 130.) We determine the correctness
of jury instructions from the totality of the instructions. (*People
v. Carrington* (2009) 47 Cal.4th 145, 192.)

Here, Robinson argues that the trial court lowered the
prosecution's burden of proof when it said:

"But I want to make a couple of comments to you at the
beginning. I will make these editorial comments as we go along
on this. It's been said that the basis of the law is not logic; the
basis of the law or the foundation of the law is human experience.

7

And the reason I mention that to you is because we put in technical format rules that have to be followed because the law is technical and precise as we can make it.

"I think you all have had the experience as a friend of mine had, where she and her husband went away and left the eldest, who is a junior or senior in high school, home for the weekend. Straight A student, no problem. And when they come back, everything seems normal but the neighbors tell them there was a wild party in the house while they were gone. Well, the parents weren't too upset and they just told him, 'You can't have parties in the house while we're gone.' So the next time they went, I think you can guess where the party was. The party was in the backyard. So they had to make it clear, expand the rules a little bit.

"And a little bit of what we do in making laws is that. We have to come up with a definition that can be precise enough, that can be understandable and comprehensible and would make sense from any sort of practical or logical point of view, but yet, they still are—is the requirement. These elements have to be met; the law has to be followed. But remember, it's based on your practical experience as a human and my practical experience and historical practical experience, and so realize that these things that I'm going to discuss, while the terms might be technical, are a way that we describe what is all of your[ ] common experience.

"When we get into issues of specific intent and general intent and union of acts and intent, we do these things regularly and don't give them a second thought. I often comment that even my dog can figure out what my intent is at certain times, because I can walk out in the morning to go to work, and he stays in his bed and watches me leave in the morning.

"On the weekend, if I walk out to the garage, he'll be standing in front of the garage door expecting to go with me to wherever I'm going, to ride along with me in the truck. And he's usually accurate about 90 percent of the time on what I'm doing. Sometimes I fool him; I'm going into the garage to get something rather than go somewhere, but he's able to figure that out.

"And so that's just part of what we do as humans. We constantly evaluate [people's] actions and intentions in everyday life. Is someone being intentionally rude or are they having a bad day? Did the person cut us off because they just realized they missed their exit, or [is] the person impaired or a rude driver? Did someone bump into us by accident, or was there some intent to it? These are evaluations we do.

"So, with that, please keep that in the back of your mind. While we must be precise, these things are based upon experience that all of us have, at least on basic principles." The trial court then began reading the jury instructions.

Robinson's defense counsel did not object to these comments, thereby forfeiting any issue on appeal. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Even so, we consider the merits of Robinson's argument. (See generally § 1259 [we may review any instruction if defendant's substantial rights affected even if no objection made]; *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 139.)

On the merits, the trial court's comments did not lower the prosecution's burden of proof. Rather, the jury was twice correctly instructed on reasonable doubt, once during preinstruction with CALCRIM No. 103 and once before retiring for deliberations with CALCRIM No. 220. The trial court also preinstructed the jury not to "take anything I say or do during

9

the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

The challenged comments were made just before the reading of the formal instructions and not in the context of trying to elucidate on or to explain the reasonable doubt standard. For that reason, the cases Robinson cites are distinguishable because they concern trial courts' direct comments about the reasonable doubt standard. (See, e.g., *People v. Garcia* (1975) 54 Cal.App.3d 61; *People v. Johnson* (2004) 115 Cal.App.4th 1169; *Johnson, supra,* 119 Cal.App.4th at pp. 985–986.) In *Garcia,* at page 68, for example, the trial court gave the proper reasonable doubt instruction but then improperly amplified it by saying, " 'In other words, reasonable doubt means just what the term implies, doubt based upon reason, doubt that presents itself in the minds of reasonable people who are weighing the evidence in the scales, one side against the other, in a logical manner in an effort to determine wherein lies the truth.' " This amplification was improper because it suggested that a preponderance of the evidence standard applied. (*Id.* at pp. 68–69.)

The trial court in *People v. Johnson, supra,* 115 Cal.App.4th at page 1171, similarly expanded on the reasonable doubt instruction by saying, " 'The burden is proof beyond a reasonable doubt. A doubt that has reason to it, not a ridiculous doubt, not a mere possible doubt. Because we all have a possible doubt whether we will be here tomorrow. That's certainly a possibility. We could be run over tonight. God, that would be a horrible thing, but it's a possibility. It's not reasonable for us to think that we will because we plan our lives around the prospect of being alive. We take vacations; we get on airplanes. We do all these things because we have a belief beyond a reasonable doubt

10

that we will be here tomorrow or we will be here in June, in my case, to go to Hawaii on a vacation. But we wouldn't plan our live[ ]s ahead if we had a reasonable doubt that we would, in fact, be alive.' " This comment lowered the reasonable doubt standard by equating everyday decisions about planning vacations and scheduling flights with the same depth of deliberative process required by the reasonable doubt standard. (*Id.* at p. 1172; accord, *Johnson*, *supra*, 119 Cal.App.4th at pp. 985–986.)

In contrast to these cases, the trial court's comments here made no direct or indirect reference to reasonable doubt. Rather, considered as a whole, the trial court was saying that jurors had to follow technical, precise rules of law; hence, it analogized to parents who had to expand the no-parties-in-the-house rule to parties in the backyard as well. As for the trial judge's dog who could tell what the judge was going to do 90 percent of the time, that was simply the judge's way of explaining that evaluating evidence was part of the jurors' job, which could be informed by their experiences and common sense. (See, e.g., *People v. Venegas* (1998) 18 Cal.4th 47, 80 [jurors may use common sense and good judgment to evaluate weight of evidence].) In context, the jury would not have understood the comments to have related to reasonable doubt. No error occurred.

II.    Competency

Dr. Michael Musacco evaluated Robinson for the defense under Evidence Code section 1017.[4] Thereafter, the trial court

---

[4] Evidence Code section 1017, subdivision (a), states, "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a

11

twice appointed him to evaluate Robinson's competence to stand trial under section 1368 and both times found Robinson was competent to stand trial. Robinson now raises two issues regarding the competency proceedings. First, there was substantial evidence to raise a doubt as to Robinson's competence to stand trial. Second, appointing Dr. Musacco under section 1368 violated Robinson's attorney-client and psychotherapist-patient privileges and his right to counsel.

A.    *Additional background*

Robinson was originally represented by a public defender who retained Dr. Musacco to evaluate Robinson, apparently under Evidence Code section 1017. After the public defender was relieved due to a conflict of interest, attorney Ronald Carter began representing Robinson. Carter retained Dr. Middleton to evaluate Robinson for the defense, and it was Dr. Middleton, and not Dr. Musacco, who testified for the defense at trial before the jury.

During pretrial proceedings, on April 30, 2018, the trial court granted a defense motion to have Robinson examined to determine his competence to stand trial, per section 1368. Apparently unaware that the defense had previously retained Dr. Musacco, the trial court appointed him to conduct that examination—without objection from the defense. In a written report filed on May 21, 2018, the doctor found that while Robinson was "experiencing emotional distress associated with

criminal proceeding in order to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition."

12

the seriousness of his crimes," he may have been exaggerating "deficits in his trial competency." The doctor diagnosed Robinson with major depressive disorder and malingering and opined in the report that Robinson was competent to stand trial. On May, 22, 2018, the trial court accordingly found that Robinson was competent to stand trial.

During trial on August 2, 2018, the video recording of Robinson's statement to the detective was being played for the jury. While it was being played, Robinson declared he would not watch it and was done for the day. After Robinson and the jury left the courtroom, his counsel reported that Robinson did not want to watch "anymore of this" and "obviously got very upset about it." Counsel said he was trying to determine whether Robinson could participate in trial, as he "can't communicate with me, which has been what's going on." Counsel added that "this has simply gotten worse through the day," that on prior days Robinson "had issues," and the day before he had not paid attention and instead shuffled through papers and read the interview. Counsel therefore declared a doubt about Robinson's competency and asked for an evaluation under section 1368.

The trial court said it would not grant the motion at that time but would hold an "abbreviated hearing" and appoint Dr. Musacco to evaluate Robinson to help it decide whether there was substantial evidence to support the motion because, based on its observations of Robinson and counsel's representations, the trial court was not persuaded there was substantial evidence to suspend proceedings.[5]

---

[5] The prosecutor added his observation that Robinson was acting out of anger and frustration.

Defense counsel now objected to this second appointment of Dr. Musacco under section 1368, describing it as "inappropriate" because the doctor had talked to Robinson twice before. Defense counsel explained that the public defender who had previously represented Robinson had initially retained Dr. Musacco to consult with the defense. Notwithstanding that retention, the trial court thereafter appointed Dr. Musacco to evaluate Robinson under section 1368, albeit without objection from defense counsel to that first appointment under section 1368.

The trial court responded that the doctor's retention by the defense would have prevented his first appointment under section 1368—except that the defense had agreed to let the doctor evaluate him. Defense counsel admitted his mistake, saying that when Dr. Musacco was appointed to conduct the prior section 1368 evaluation, "to be honest, when that happened, I probably didn't—wasn't in my mind that he had previously talked to the client, since it was the public defender that had done it. Although I had the report, and so it is just my bad."

The trial court overruled the objection to Dr. Musacco and found that while his retention by the defense would have normally prevented him from evaluating Robinson under section 1368, the doctor could proceed with the evaluation, as the trial court thought it was better to have a doctor familiar with Robinson do it.

Dr. Musacco proceeded to examine Robinson and then to testify at a hearing out of the jury's presence. At the hearing, the doctor described Robinson as being "exceptionally distressed and distraught" and at his wit's end. Robinson told the doctor that he did not want to participate in the court proceedings, he'd had enough, and he wanted to go to the state hospital to get his head

14

straight. Dr. Musacco was also aware that Robinson's outburst in court happened while watching his videotaped statement, which the doctor surmised was exceptionally uncomfortable for Robinson because he'd made comments in his statement about his father, who was in the courtroom.

Dr. Musacco said he had reviewed Robinson's jail records, which were the deciding factor in the doctor's decision. In those records, Robinson talked about depression and stress but, the doctor observed, who wouldn't experience those symptoms in these circumstances? Otherwise, Robinson was able to communicate with staff, denied symptoms of mania, and there was no evidence of psychosis, disruptive behaviors or bipolar disorder, loss of consciousness or blackouts or impairment in "reality contact." While Dr. Musacco agreed that Robinson was legitimately stressed, there was no evidence of an underlying illness that would cause Robinson to be incompetent to stand trial. He also did not find that Robinson was malingering.

On cross-examination, Dr. Musacco disagreed with a finding by Dr. Middleton made in a written report that Robinson had a Bipolar I disorder and a possible neurocognitive disorder. Dr. Musacco criticized Dr. Middleton for basing his diagnosis solely on Robinson's self-report and not on "longitudinal" observations, namely, the year and a half of treatment records from jail showing that nobody had found evidence of a bipolar disorder or mania. Dr. Musacco acknowledged that Robinson was taking Wellbutrin (an antidepressant), Neurontin (a mood stabilizer), and sleeping medications. But Dr. Musacco also observed that Robinson had been functioning before his arrest, e.g., going to school. The doctor admitted he did not have access to any pre-incarceration treatment records, although he did know

that Robinson had been treated as a teenager for ADHD and had counseling.

Dr. Musacco stated his position that one can only be found incompetent if there is a mental illness diagnosis. Still, the doctor agreed that somebody under stress can suffer symptoms of a mental illness that cause them to be incompetent, but he did not find that to be the case here because there was no consistency of symptoms being displayed in other areas. The timing of Robinson's disruptive behavior in court was consistent with being distressed and wanting to avoid the situation, as opposed to a person who has a major mental illness and is incapable of participating in proceedings. Therefore, while the doctor thought that the extent of Robinson's distress was severe and impacted his ability to assist his counsel, it was not due to a mental illness: "[N]ot everyone who engages in disruptive behavior is necessarily incompetent." While the doctor agreed that Robinson had a depressive disorder his symptoms were not occurring across his daily life as opposed to just in court.

In ruling, the trial court found that Dr. Musacco's testimony was consistent with its observation that Robinson was under tremendous stress, which the trial court suggested had been building up. This led to Robinson crumpling paper and using a vulgarity while looking at the judge. The trial court also noted that Robinson that same day had made a *Marsden*[6] motion based on defense counsel's lack of optimism about the success of the case and had previously participated in the proceedings and been reasonably compliant. This evidenced to the trial court that Robinson was able to participate in the proceedings. The trial court denied the request for a finding under section 1368 and

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

found that the record did not persuasively show that because of a mental illness Robinson was incapable of understanding the nature of the proceedings or unable to assist counsel, as opposed to unwilling to assist him.[7]

      B.     *There was insufficient evidence to raise a doubt as to Robinson's competence.*

We first address Robinson's contention that there was substantial evidence to raise a doubt about his competence to stand trial and therefore the trial court should have held a competency hearing under section 1368.

Due process forbids trying or convicting a criminal defendant who is mentally incompetent to stand trial. (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15; *People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*).) A person is incompetent to stand trial if, as a result of a mental health disorder or developmental disability, the defendant is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367.) A trial court must suspend criminal proceedings if a doubt arises in the judge's mind about the defendant's competence. (§ 1368.) Thus, if the defendant produces substantial evidence that his mental illness renders the defendant incapable of understanding the nature of the proceedings and assisting the defense, then the defendant has a right to a hearing. (*Rodas*, at p. 231.)

"[S]ubstantial evidence for this purpose is evidence 'that raises a reasonable or bona fide doubt' as to competence, and the duty to conduct a competency hearing 'may arise at any time

---

[7] After the trial court ruled, Robinson said he did not want to be present for the day but would come to court the next day.

17

prior to judgment.' " (*Rodas, supra*, 6 Cal.5th at p. 231.) Evidence relevant to competence may include the defendant's demeanor, irrational behavior, and prior mental evaluations. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) But the evidence is not substantial enough unless it raises a reasonable or bona fide doubt as to the defendant's mental competence. (*Ibid.*; *People v. Wycoff* (2021) 12 Cal.5th 58, 83.) The standard may be satisfied if at least one competent expert who has examined the defendant testifies with particularity that the defendant is incapable of understanding the proceedings or assisting in the defense because of mental illness. (*Wycoff*, at p. 83.) There need not be a large quantity of evidence for a doubt to arise; rather, there must be some evidence of sufficient substance that it cannot be dismissed as being inherently unpersuasive. (*Ibid.*)

If such a doubt is created, then section 1369 dictates what follows: an expert is appointed to examine the defendant, and a competency trial before a judge or jury is held. If, after a competency trial, the defendant is found competent to stand trial, then a trial court may rely on that finding unless thereafter the trial court " ' "is presented with a substantial change of circumstances or new evidence" casting a serious doubt on the validity of that finding.' " (*Rodas, supra*, 6 Cal.5th at p. 231.) The "duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier formal inquiry into defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Id.* at pp. 234–235.)

"We apply a deferential standard of review to a trial court's ruling concerning whether another competency hearing must be held. [Citation]. We review such a determination for substantial evidence in support of it." (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

We find that substantial evidence existed for the trial court's ruling that no full competency hearing was required under these circumstances. Rather, the impetus for counsel declaring a doubt was Robinson's outburst. However, "disruptive conduct and courtroom outbursts by the defendant do not necessarily demonstrate a present inability to understand the proceedings or assist in the defense." (*People v. Mai* (2013) 57 Cal.4th 986, 1033.) As Dr. Musacco pointed out, the timing of Robinson's outburst—while the video of his incriminating statement was being played—appeared to be related to Robinson's discomfort with watching it with his father in the courtroom. He was responding to a deeply uncomfortable situation rather than acting out of mental illness. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 525–526 [defendant's outburst indicated his depth of understanding of proceedings rather than incompetence], overruled on another ground by *People v. Black* (2014) 58 Cal.4th 912, 919–920; *Mai*, at pp. 1035–1036 [defendant's self-defeating outbursts showed anger and resentment, not incompetence, and were understandable reaction to proceedings].) Defense counsel's own statements buttress that conclusion. He said Robinson had not been paying attention and was instead rifling through papers *and reading the interview*, which suggests that Robinson was preoccupied with his incriminating statements.

Although defense counsel did say that Robinson could not communicate with him, counsel did not explain further what he

19

meant, either when he declared a doubt about Robinson's competence or after Dr. Musacco testified. While we accord some weight to counsel's assertion of doubt about his client's competence, it does not necessarily constitute substantial evidence of incompetence. (*People v Sattiewhite* (2014) 59 Cal.4th 446, 465.) It is not clear based on defense counsel's representations that Robinson was unable to communicate with him or was just unwilling to do so because he was discomfited by the situation.

Instead, Dr. Musacco suggested it was the latter. Just before the hearing, he had examined Robinson and reviewed his jail medical records. He agreed that Robinson was legitimately stressed but did not agree the stress stemmed from a mental illness. To the doctor, Robinson's jail medical records were especially telling, because they were devoid of evidence of an underlying illness; Robinson, for example, had not lost consciousness, engaged in disruptive behavior, or exhibited symptoms of psychosis or mania while in jail. And while the doctor did not rule out that somebody under stress could suffer symptoms of mental illness that rendered them incompetent, he ruled that out as a possibility here because Robinson was not displaying a consistency of symptoms. That is, any symptoms of depression disorder did not appear in Robinson's daily life as opposed to just in court.

All this was consistent with the trial court's observations, to which we afford deference because it was in the best position to appraise Robinson's conduct. (See, e.g., *People v. Mai, supra*, 57 Cal.4th at p. 1033.) The trial court observed that Robinson was under stress that had been building up, culminating in Robinson crumpling paper and uttering a vulgarity, apparently directed at

the trial court. Also notable to the trial court was that on the same day counsel declared a doubt about Robinson's competence, Robinson had made a *Marsden* motion that suggested he and counsel were not agreeing but that also showed a grasp of the proceedings. Indeed, immediately after the trial court denied the section 1368 motion, the trial court directly discussed with Robinson his right to be in court, and Robinson responded appropriately, demonstrating that he understood the proceedings.

This case is therefore similar to *People v. Nelson* (2016) 1 Cal.5th 513, 519, where the only evidence the defense presented regarding competence was counsel's comment that his client was not cooperating and a doctor's testimony that he saw no evidence of psychosis, active delusions, or hallucinations. Instead, the defendant seemed to understand the doctor, who suspected the defendant was choosing not to speak because he did not like doctors and wanted the death penalty. Otherwise, the defendant had no problem talking to a paralegal. Based on this, the record did not persuasively show that because of mental illness the defendant was "incapable of understanding the nature of the proceedings or unable (as opposed to unwilling) to assist counsel." (*Id.* at p. 560.)

Robinson, however, refers to evidence that he believes raised a doubt about his competence. He points out that Dr. Musacco did not review his pre-incarceration treatment records, which apparently showed that Robinson was treated for ADHD. However, defense counsel did not introduce those records or, more important, have an expert tie them to Robinson's competence to stand trial.

Robinson then argues that Dr. Middleton's diagnosis of Bipolar I disorder and that he took sleeping aids and psychotropic medications were sufficient evidence of his incompetence to stand trial. However, Dr. Musacco disagreed with the diagnosis that Robinson was bipolar. But even assuming that Robinson was bipolar, there was still no evidence or expert testimony that his condition rendered him incompetent to stand trial at the point in time counsel declared a doubt.[8] And the bare fact that Robinson was taking psychotropic medications, without more, was insufficient to compel a hearing under section 1368. Rather, psychotropic medication can be prescribed to help a person become competent to stand trial. (See § 1370, subd. (a)(2)(B)(ii)(III) [antipsychotic medication may be administered to render a defendant competent to stand trial].) In short, there was no expert testimony or other evidence tethering any bipolar diagnosis or the medications to Robinson's competency to stand trial.

The evidence therefore was not in conflict. Instead, as the trial court found, there was insufficient evidence of a substantial

---

[8] Robinson also cites Dr. Middleton's *trial* testimony as evidence of his incompetence to stand trial. But that testimony occurred *after* the hearing on Robinson's competence and therefore was not before the trial court. And while a trial court must declare a doubt on its own at any point when presented with substantial evidence of a defendant's incompetence (*People v. Castro* (2000) 78 Cal.App.4th 1402, 1415, disapproved on another ground by *People v. Leonard* (2007) 40 Cal.4th 1370, 1389), Dr. Middleton's testimony alone did not constitute such evidence, as it concerned whether Robinson had a mental disorder that negated his specific intent to commit the crimes and not his competence to stand trial.

change of circumstances or new evidence that cast a doubt as to Robinson's competence.

C.   *Any error in appointing Dr. Musacco under section 1368 was harmless.*

Dr. Musacco played two roles during the criminal proceedings:  as an expert appointed to assist the defense under Evidence Code section 1017 and as an expert appointed to evaluate whether Robinson was competent to stand trial under section 1368.  Robinson now contends that appointing the doctor to evaluate him under section 1368 violated Robinson's attorney-client privilege, psychotherapist-patient privilege, and right to effective and conflict-free counsel.[9]  We now explain why any error was harmless.

At a criminal trial, a psychologist or other expert can play different roles.  One is as a member of the defense team, appointed to provide a defendant's attorney with information relevant to a plea based on insanity or to a defense based on the defendant's emotional or mental condition.  (Evid. Code, § 1017, subd. (a).)  A second is as an expert, appointed to evaluate the defendant and to render an opinion to the trial court about the defendant's competence to stand trial.  (§ 1368.)  Information gleaned under a section 1368 appointment is not subject to the attorney-client privilege.  However, when a doctor is appointed under Evidence Code section 1017 to examine the defendant and to provide the results of that examination, including any report, information, and communications relating to it, to defense counsel, the attorney-client and other privileges protect those

---

[9] Robinson's contention concerns only Dr. Musacco's second appointment under section 1368.

23

communications from disclosure.  (*People v. Lines* (1975) 13 Cal.3d 500, 514 (*Lines*); *Elijah W. v. Superior Court* (2013) 216 Cal.App.4th 140, 150–152; *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320 [right to effective counsel includes right to reasonably necessary ancillary defense services]; Evid. Code, § 1012 [psychotherapist-patient  privilege].)

From this, it follows that an expert usually may not play more than one role at a criminal trial.  The problems that arise when an expert plays more than one role in a single criminal proceeding were on display in *Lines*, *supra*, 13 Cal.3d 500.  In that case, Dr. Markman[10] was initially appointed to examine the defendant under, among other statutes, Evidence Code section 1017 to assist the defense.  (*Lines*, at p. 514.)  As such, the attorney-client privilege permanently protected the results of and any report of the examination, information and communications relating to the examination.  (*Ibid*.)  After the defendant pled not guilty by reason of insanity, the trial court reappointed Dr. Markman to examine the defendant and to report to the court.  (*Ibid*.)  Thereafter, at trial, the People called Dr. Markman to testify, over a defense objection.  (*Id*. at p. 509.)

The court found that Dr. Markman could testify about the results of his examination pursuant to his reappointment, but he could not testify about the results of his first examination of defendant and his reports to defense counsel.  (*Lines*, *supra*, 13 Cal.3d at p. 515.)  However, the court recognized the fine line it was drawing in finding that information relating to Dr. Markman's first examination of the defendant was privileged,

---

[10] Although *Lines* involved multiple experts whose appointments proved problematic, we focus on one expert for the sake of simplicity.

while information relating to his second examination of the defendant was not and, due to its unprivileged nature, the doctor could testify about it. The court thus noted that there could be "situations where such information cannot be so precisely compartmentalized and where it may be an impossible task for the psychiatrist to report or testify as to unprivileged information without drawing upon and utilizing that which is privileged." (*Id*. at pp. 515–516.) *Lines*, at page 516, accordingly disapproved reappointing a doctor, "whose earlier examination is protected by privilege, to make a subsequent examination under circumstances" carrying no protection of privilege. The court therefore found that the defense objection to Dr. Markman's testimony at trial should have been sustained.

Nonetheless, the court further found that the error was subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818. (*Lines, supra*, 13 Cal.3d at p. 516.) Because the erroneously admitted testimony about the defendant's sanity was essentially the same as properly admitted testimony from other doctors on the same issue, the court concluded, after examining the entire cause, it was not reasonably probable a result more favorable to the defendant would have been reached in the absence of the error. (*Ibid*.)

Here, the People argue that defense counsel failed to preserve an objection under *Lines* because he did not cite any constitutional or other grounds. That may be, but defense counsel outlined the history of Dr. Musacco's involvement in the case and was clear that the fundamental basis for the objection was that the doctor had previously evaluated Robinson *for the defense*. The totality of the hearing made it clear the objection was based on the privileged nature of Dr. Musacco's appointment

25

by the defense.  The trial court clearly understood the basis for the objection because it agreed it was generally inappropriate to appoint an expert under section 1368 whom the defense had previously retained.[11]

The People also argue that because the defense failed to object to Dr. Musacco's first appointment under section 1368, the defense forfeited any objection to the second appointment.  We doubt that counsel's waiver of any privilege concerning Dr. Musacco's first appointment under section 1368 precluded him from objecting to the doctor's second appointment under that section.  (See generally Evid. Code, §§ 953 [only holder of privilege can waive it], 912, subd. (a) [consent to disclosure manifested by statement or conduct indicating consent to disclosure]; *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 652–653 [whether inadvertent disclosure of privileged information constitutes waiver involves examining holder's subjective intent and relevant circumstances for manifestation of holder's consent to disclose information]; *Roberts v. Superior Court* (1973) 9 Cal.3d 330, 343 [waiver of a privilege "must be a voluntary and knowing act done with sufficient awareness of the relevant circumstances and likely consequences"]; see also *Lohman v. Superior Court* (1978) 81 Cal.App.3d 90, 94 [attorney-client privilege afforded enormous respect].)  However, we do not address that issue at length because any error regarding Dr. Musacco's reappointment was harmless.

---

[11] Even if Robinson forfeited his right to appellate review, we would exercise our discretion to address the issue because it affects his substantial rights.  (See generally § 1259; *Johnson, supra,* 119 Cal.App.4th at p. 984.)

By appointing Dr. Musacco under section 1368 when he had been previously appointed to aid the defense under Evidence Code section 1017, the trial court did exactly what *Lines* disapproved. Even so, any error was harmless. First, unlike Dr. Markman in *Lines*, Dr. Musacco did not disclose any privileged matter, and, also unlike the defense counsel in *Lines*, defense counsel here did not object during Dr. Musacco's testimony that privileged matter had been disclosed. Dr. Musacco's testimony instead focused on his meeting with Robinson the day before the hearing, Robinson's medical records from jail, and addressing Dr. Middleton's report. Thus, notwithstanding the concern expressed in *Lines*, which we share, of the danger an expert may not be able to compartmentalize what they learned in a privileged setting and instead will be influenced by it at a later proceeding under section 1368, it is not apparent that this occurred here. On this record, no disclosure of privileged matter occurred.

Second, no prejudice is otherwise apparent. When counsel declared a doubt about Robinson's competence to stand trial, the trial court was immediately doubtful, saying that based on what counsel had said and its observations of the situation, there was not substantial evidence to raise a doubt about Robinson's competence. Although the trial court was already unpersuaded that further proceedings were necessary, it nonetheless decided to have Dr. Musacco evaluate Robinson and to hold what the trial court called an "abbreviated hearing" on the issue. As we have said, the evidence at that hearing only confirmed the trial court's initial ruling, that there was insufficient evidence to raise a doubt about Robinson's competence to stand trial.

Robinson, however, argues that any error was not harmless because Dr. Musacco " 'pulled his punches.' "  By this, it appears Robinson is saying that Dr. Musacco could have, but failed to, access his pre-incarceration medical records.  We fail to see how this evidences any pulling of punches or deliberate avoidance of evidence that might have spoken to Robinson's supposed incompetence to stand trial.  Instead, Dr. Musacco did testify about some of Robinson's pre-incarceration medical history, including that Robinson was treated for ADHD when he was 13 or 14 years old, but was clearly unpersuaded that they showed incompetence to stand trial six years later.  Also, Robinson had access to those records and could have produced them if relevant to his competence and cross-examined the doctor with them, but he did not do so.

Robinson also argues that any error is not harmless because it is impossible to tell what a properly appointed expert would have said about his competency.  We would put it another way:  what another expert would have testified is speculative.  Robinson nonetheless points out that his expert Dr. Middleton, who testified at trial, said he was bipolar.  This is unpersuasive because Robinson could have called Dr. Middleton to testify at the hearing to rebut Dr. Musacco but didn't do so.  It is also unclear that Dr. Middleton would have said Robinson was incompetent to stand trial because that is a different issue than whether Robinson could form intent to commit certain of the crimes, which was the subject of Dr. Middleton's trial testimony.

Any error in reappointing Dr. Musacco was therefore harmless.

III.   Ineffective assistance of counsel based on misstatement of evidence

In closing argument, defense counsel misstated that Robinson had moved Diana 240 *yards*—as opposed to 240 *feet*—when discussing the aggravated kidnapping charges.  Robinson now argues that this misstatement constituted ineffective assistance of counsel.  We do not agree.

To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms *and* that counsel's deficient performance resulted in prejudice, that is, there is a reasonable probability that but for counsel's failings defendant would have achieved a more favorable result. (*People v. Bell* (2019) 7 Cal.5th 70, 125; *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

How far Robinson moved Diana was relevant to the aggravated kidnapping charges (counts 3 & 4).  Aggravated kidnapping requires the victim to be forced to move a substantial distance, the movement cannot be merely incidental to the target crime, and the movement must substantially increase the risk of harm to the victim.  (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153; § 667.61, subd. (d)(2).)  Hence, when defense counsel said that Robinson moved Diana 240 yards instead of 240 feet, he substantially increased the distance she was moved by a distance of over two football fields, which would almost certainly satisfy the requirement she be moved a substantial distance.

Although defense counsel confused yards with feet, we doubt that his simple, one-time confusion about yards and feet fell below the objective standard of reasonableness—and it certainly did not result in prejudice.  Instead, the jury was

instructed with CALCRIM No. 104 that nothing attorneys said in opening and closing statements was evidence. The jury was also instructed what did constitute evidence: a witness's sworn testimony, admitted exhibits, and anything else the trial court said was evidence. (CALCRIM No. 104.) The evidence was that Robinson moved Diana 240 *feet*. An officer testified that he measured how far Diana was moved from a stop sign to the alley, and it was 240 feet. Jurors saw photographs and maps of the area over which Diana was moved and could ascertain for themselves that she was not moved the length of over two football fields. Diana's testimony did not support a finding she was moved the length of over two football fields, as she said that Robinson moved her about one house length in the alley. Finally, the prosecutor in closing argument correctly stated several times that Diana had been moved 240 feet, saying that dragging "her 240 feet to an alley is a substantial distance."

Given that defense counsel's misstatement of fact was brief and isolated, that the jury was properly instructed on what constituted evidence, and the otherwise unambiguous evidence, there is no reasonable probability that Robinson would have achieved a more favorable result in the absence of defense counsel's misstatement.

IV.    Fair and adequate notice of enhancements

Robinson makes two arguments why his LWOP sentence must be reversed. First, he did not receive notice he was facing LWOP on counts 3 and 4 under the "One Strike" law because the information did not cite section 667.61, subdivision (*l*), the applicable penalty provision. Second, the jury's findings on the kidnapping allegations as to those counts must be reversed

30

because the information and instructions referred to the One Strike law as an enhancement rather than an allegation.

A. *Robinson received fair notice he could be sentenced under the One Strike law.*

Section 667.61, the One Strike law, is an alternative, harsher sentencing scheme for certain forcible sex crimes. (*People v. Mancebo* (2002) 27 Cal.4th 735, 741.)  When a defendant is subject to sentencing under that or another scheme, the defendant has a due process right to fair notice of the specific sentence enhancement allegations that will be used to increase punishment under the applicable law.  (*Id.* at p. 747.)  Due process is satisfied if the information apprises the defendant of the potential of an enhanced penalty and alleges the facts necessary to establish that penalty's applicability.  (*People v. Sok* (2010) 181 Cal.App.4th 88, 96, fn. 8.)  The "specific numerical subdivision of a qualifying One Strike circumstance" need not be pleaded.  (*Mancebo*, at p. 753.)  Rather, an information simply must afford a One Strike defendant fair notice of the qualifying statutory circumstances that are being pled, proved, and invoked to support sentencing.  (*Id.* at pp. 753–754.)

A similar situation was at issue in *People v. Neal* (1984) 159 Cal.App.3d 69.  In that case, the jury found the defendant guilty of sex crimes and found true an enhancement for using a deadly weapon, designated in the information as a violation of section 12022, subdivision (b).  The trial court, however, sentenced the defendant under section 12022.3, which applied to certain violent sex offenses and carried a three-year term rather than the one-year term under section 12022, subdivision (b). (*Neal*, at p. 72.)  The Court of Appeal rejected the defendant's argument the judgment had to be modified to sentence the

defendant under the section identified in the information, stating that "where the information puts the defendant on notice that a sentence enhancement will be sought, and further notifies him of the facts supporting the alleged enhancement, modification of the judgment for a misstatement of the underlying enhancement statute is required only where the defendant has been misled to his prejudice." (*Id.* at p. 73.)

Similarly here, Robinson was sentenced to LWOP per section 667.61, subdivision (*l*), which states, "A person who is convicted of an offense specified in subdivision (n) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e), upon a victim who is a minor 14 years of age or older shall be" sentenced to LWOP. Although the information did not expressly refer to subdivision (*l*) of section 667.61, Robinson nonetheless had fair notice he was subject to being sentenced under it. Count 3 alleged that Robinson forcibly penetrated Diana (§ 289, subd. (a)(1)(C)). Count 4 alleged that Robinson forcibly orally copulated her (former § 288a, subd. (c)(2)(C)). Both counts alleged that Diana was a minor, 14 years old or older. Also, both counts alleged circumstances under subdivisions (d) and (e) of section 667.61; specifically, they alleged (1) that Robinson kidnapped Diana and he moved her in a way that substantially increased the risk of harm over and above the level of risk necessarily inherent in the offense charged within the meaning of section 667.61, subdivision (d)(2), and (2) he kidnapped her within the meaning of section 667.61, subdivision (e)(1). The information therefore alleged the fact of the victim's qualifying age and the circumstances—subdivisions (d) and (e)—that made Robinson subject to LWOP.

Robinson thus had fair notice he was facing LWOP if convicted of count 3 or 4.

B.    *Robinson was not prejudiced by any misnomer concerning the One Strike law.*

Robinson also contends that misstatements referring to the One Strike law as an enhancement rather than as a penalty provision violated his due process rights. He thus notes that the information referred to the One Strike allegations as an "enhancement," jury instructions called the law an allegation or enhancement, and the trial court referred to the law as both an enhancement and an allegation, saying it was using those terms interchangeably. While it is true that the One Strike law is an alternative penalty and not an enhancement (*People v. Mancebo*, *supra*, 27 Cal.4th at p. 741), it is unclear how any misnomer prejudiced Robinson, especially where, as here, the trial court advised it was using the terms enhancements and allegations interchangeably and the jury was properly instructed on the One Strike law. As the People put it in their response to this contention, this is nothing more than an attempt to elevate a mere matter of nomenclature into an issue of constitutional magnitude. We reject this attempt.

V.    Cruel and/or unusual punishment

The trial court sentenced Robinson to LWOP on counts 3 and 4 (stayed) under the One Strike law. He contends that his LWOP sentence facially and as applied to him violated federal and state constitutional prohibitions against cruel and/or unusual punishment. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)

33

A.    *Forfeiture*

Robinson did not object that his sentence was cruel and/or unusual punishment in the trial court.  Such failure to object that a sentence constitutes cruel and/or unusual punishment forfeits appellate review because the issue often requires a fact-bound inquiry.  (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.)  However, because Robinson claims that the failure to object constituted ineffective assistance of counsel, we address the issue and find, as we next explain, that Robinson suffered no prejudice from any failure to object.  (See generally *Strickland v. Washington*, *supra*, 466 U.S. 668 [ineffective assistance of counsel claim requires showing that counsel fell below standard of care *and* prejudice].)

B.    *Robinson's facial challenge*

Robinson first argues that the One Strike law is cruel and/or unusual punishment on its face.  Such a challenge to the facial constitutionality of a statute will fail unless the statutory terms inevitably pose a conflict with applicable constitutional prohibitions.  (*Persky v. Bushey* (2018) 21 Cal.App.5th 810, 818.)  Statutes are presumed to be constitutional.  (*Ibid.*)  And we must be mindful that principles of separation of powers require courts to exercise judicial restraint in passing on the acts of other branches of government and to give great weight to legislative findings unless they are unreasonable or arbitrary.  (*Tos v. State of California* (2021) 72 Cal.App.5th 184, 195.)

Robinson's argument about the facial unconstitutionality of the One Strike law appears to rest on *Graham v. Florida* (2010) 560 U.S. 48, which held that LWOP may not be imposed on *juveniles* who commit nonhomicide offenses.  While Robinson was

young when he committed his crimes—19—he was not legally a juvenile. *Graham*, therefore, is distinguishable.

Otherwise, section 667.61, subdivision (*l*), of the One Strike law imposes LWOP for specific sex crimes against some of the most vulnerable members of our society, minors, and that are committed under aggravating circumstances, such as aggravated kidnapping. Robinson acknowledges that courts have found that the One Strike law is not cruel and/or unusual punishment even though the sentence is imposed for nonhomicide offenses. *People v. Reyes* (2016) 246 Cal.App.4th 62, 85, for example, upheld an LWOP sentence imposed on a defendant who forcibly raped and orally copulated a minor during the commission of a residential burglary. *Reyes* relied on other decisions upholding sentences under the One Strike law. (See, e.g., *People v. Alvarado* (2001) 87 Cal.App.4th 178 [rejecting 8th Amend. challenge to 15-years-to-life sentence for rape committed during commission of burglary]; *People v. Crooks* (1997) 55 Cal.App.4th 797, 805–809 [rejecting constitutional challenge to 25-years-to-life sentence for rape committed during first degree burglary].)

Given Robinson's acknowledgment of these cases and that his facial challenge rests on his personal circumstances, which suggests that his real challenge to his sentence is an as-applied one, we turn to that issue.

C.      *Robinson's sentence does not violate our state or federal constitutions.*

A punishment is cruel or unusual under our state constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) We use three techniques to make this determination: first,

examine the nature of the offense and/or the offender with particular regard to the degree of danger both present to society; second, compare the challenged penalty with the punishments for more serious offenses in California; and third, compare the challenged penalty with the punishments prescribed for the same offense in other states. (*Id*. at pp. 425–427.) Disproportionality need not be established in all three areas. (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38.)

The Eighth Amendment to the United States Constitution prohibits a sentence that is grossly disproportionate to the severity of the crime. (*Rummel v. Estelle* (1980) 445 U.S. 263, 271.) The federal proportionality analysis closely resembles *Lynch*'s analytical framework (*Solem v. Helm* (1983) 463 U.S. 277, 291–292) and affords no greater protections than that provided by California's constitution (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510). Accordingly, a punishment that satisfies the California standard necessarily satisfies the federal one. (Cf. *People v. Anderson* (1972) 6 Cal.3d 628.)

Because whether a punishment is cruel and/or unusual is a question of law, we exercise independent review while considering in the light most favorable to the judgment any underlying disputed facts. (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

Here, Robinson tersely addresses only the first prong of *Lynch*, suggesting his LWOP sentence was unconstitutional because he had no prior criminal history, he was 19 years old when he committed the crimes, the victim was physically uninjured, and Robinson had a major mental illness. These are certainly relevant factors, but Robinson's failure to address the nature of his offenses in greater detail is telling. (See, e.g., *People*

*v. Dillon*, *supra*, 34 Cal.3d at p. 479 [we consider offense in the abstract and facts of the crime, including motive, way it was committed, extent of defendant's involvement, and consequences of his acts]; *People v. Baker* (2018) 20 Cal.App.5th 711, 725 [insignificant criminal record and no prior history of sex crimes did not outweigh other factors].)

Diana, the victim in counts 3 and 4, was just 15 years old and on her way to school when Robinson attacked her. While lewd conduct on a child may not be the gravest of offenses when compared to murder and torture, its seriousness is nonetheless considerable. (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) Robinson came up from behind Diana, put her in a chokehold, pointed a gun at her, threatened her, and dragged her to an alley where he sexually assaulted and tried to penetrate her. He then forced Diana to take him to her house so that she could get money for him. Under analogous circumstances, *People v. Baker*, *supra*, 20 Cal.App.5th at page 715, found that a 15-years-to-life sentence was not cruel and/or unusual punishment for the crime of orally copulating a six-year-old. (Accord, *People v. Reyes*, *supra*, 246 Cal.App.4th at p. 85 [LWOP sentence for forcible rape and oral copulation of a minor during residential burglary was not cruel and/or unusual].)

And, contrary to Robinson's assertion that Diana was uninjured, she testified about the violence of the incident: Robinson put her in chokehold, leaving a bruise. Thus, aside from Diana's emotional injuries, she was physically injured. Also, this sexual assault occurred in the context of a crime spree occurring over the course of several months against a total of three women. In each case, Robinson came up from behind his victims, violently restrained them, sexually assaulted them, and

robbed two of them. The nature of the offense therefore speaks to the danger Robinson presents to society, which supports his LWOP sentence.

VI. Remand for *Franklin* hearing is unwarranted.

Robinson contends this matter should be remanded for a *Franklin* hearing to allow him to develop the record with evidence of youth-related factors that will be relevant at a youth offender parole hearing. *Franklin* hearings, however, are afforded to defendants eligible for a youth offender parole hearing under section 3051. (*Franklin*, *supra*, 63 Cal.4th at p. 269.) That section provides that a person convicted of an offense committed when the person was 25 years old or younger is eligible for release on parole at a youth-offender parole hearing held during the person's 15th, 20th, or 25th year of incarceration, depending on the offense. (§ 3051, subd. (b).) However, section 3051, subdivision (h), excludes defendants like Robinson who were sentenced under the One Strike law.

Courts of Appeal are split as to whether excluding persons like Robinson sentenced under the One Strike law from youth offender parole hearings under section 3051 violates the Equal Protection Clause of the Fourteenth Amendment, with *People v. Edwards* (2019) 34 Cal.App.5th 183 holding it does and *People v. Williams* (2020) 47 Cal.App.5th 475, holding it does not. Our Supreme Court has granted review of *Williams* to determine whether section 3051, subdivision (h), violates the equal protection clause of the Fourteenth Amendment "by excluding young adults convicted and sentenced for serious sex crimes under the One [S]trike law (Pen. Code, § 667.61) from youth offender parole consideration, while young adults convicted of first degree murder are entitled to such consideration." (July 22,

2020, S262229 [order granting review and limiting scope of review].)  Pending resolution of this issue, we will follow *Williams* and find that Robinson is not entitled to a *Franklin* hearing because he is not eligible for a youth offender parole hearing under section 3051.

VII.  Assembly Bill No. 518 and Senate Bill No. 567

Robinson contends that remand is necessary so that the trial court can consider whether he should benefit from recently enacted ameliorative laws, i.e., Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 441) and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731), both of which became effective January 1, 2022.

When Robinson was sentenced, section 654 provided that a criminal act punishable in different ways by different provisions of law must be punished under the provision providing the *longest* potential term of imprisonment.  Our Legislature has since passed Assembly Bill No. 518, which amended section 654.  As amended, section 654 now provides that an act or omission punishable in different ways by two different provisions of law, as in this case, may be punished under *either* provision.  Hence, the longest term of imprisonment is no longer mandatory.

Senate Bill No. 567 amended section 1170.  As relevant here, section 1170, subdivision (b), now makes the middle term the presumptive sentence unless certain circumstances exist.  A trial court may impose the upper term only where there are aggravating circumstances and the defendant has either stipulated to them or they have been found true beyond a reasonable doubt.  (§ 1170, subd. (b)(1)–(2).)  And where the defendant was a youth, meaning under the age of 26, the low term shall be imposed unless the trial court finds that

39

aggravating circumstances outweigh mitigating ones such that imposing the low term would be contrary to the interests of justice.  (§ 1170, subd. (b)(6).)

The amendments made by Assembly Bill No. 518 and Senate Bill No. 567 apply retroactively to cases like Robinson's which were not final when the legislation took effect.  (See generally *People v. Sek* (2022) 74 Cal.App.5th 657, 673 [Assem. Bill No. 518 is retroactive]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [Sen. Bill No. 567 is retroactive].)  These amendments to sections 654 and 1170 potentially confer ameliorative benefits to Robinson.  With respect to the counts concerning Diana, he was sentenced to LWOP on counts 3 and 4 (stayed) and lesser sentences were imposed on counts 5, 6, and 7 but stayed under section 654.  Robinson was also sentenced to the upper terms on counts 1, 11, and 14.

The People concede that the new laws are retroactive.  However, the People also argue that remand for reconsideration of the sentence under newly-amended section 654 is unnecessary because there is no reasonable likelihood the trial court would impose a different judgment.  (See generally *People v. Gutierrez* (2104) 58 Cal.4th 1354, 1391.)  The People similarly argue that any error in imposing the upper terms was harmless beyond a reasonable doubt because a jury necessarily would have found at least one aggravating circumstance true.  (See generally *People v. Flores*, *supra*, 73 Cal.App.5th at p. 1039.)  The People rely on the aggravating circumstances the trial court cited at sentencing: the manner in which the crimes were carried out, that Robinson used a weapon for some of the crimes, and his violent conduct indicated a serious danger to society.  As to that last aggravating circumstance, the trial court further noted that Robinson's

40

standardized testing showed a likelihood he would recidivate. But, in addition to these aggravating circumstances, the trial court also found there was a circumstance in mitigation: Robinson had no known criminal history.

Given that the trial court found one mitigating circumstance and based on Robinson's age, we find that remand is appropriate for the trial court to reconsider Robinson's sentence per Assembly Bill No. 518 and Senate Bill No. 567. We express no opinion on how any discretion should be exercised on remand.[12]

---

[12] Because we are remanding for reconsideration of Robinson's sentence, we need not address all of the arguments raised in Robinson's supplemental reply brief.

## DISPOSITION

The matter is remanded with the direction to the trial court to reconsider Robinson's sentence under Assembly Bill No. 518 and Senate Bill No. 567.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

42